In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2603

Robert E. Alexander,

Plaintiff-Appellant,

v.

Wisconsin Department of Health
and Family Services, Susan Moritz,
Claire Nagel, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99 C 429--Barbara B. Crabb, Chief Judge.

Argued November 13, 2000--Decided August 27, 2001

Before Harlington Wood, Jr., Kanne, and Diane
P. Wood, Circuit Judges.

Kanne, Circuit Judge.  Robert Alexander
sued his former employer, the Wisconsin
Department of Health and Family Services
(the "Department"), alleging that he was
subjected to unlawful race discrimination
and retaliation that resulted in his
receiving a ten-day suspension from work
without pay and, eventually, his
termination. Alexander also filed claims
against several Department employees for
their involvement in his termination, his
ten-day suspension, and a five-day
suspension that he received previously.
The defendants filed a motion for summary
judgment on all of Alexander's claims.
The district court granted this motion,
finding that Alexander failed to provide
any evidence that the disciplinary action
he received was due to his race or in
retaliation for his complaining about
discrimination in the workplace. Because
we find that Alexander is unable to show
that the reasons for which he was
disciplined were pretext for race
discrimination or retaliation, we will
affirm the decision of the district
court.

I.  History

This appeal is from a grant of summary judgment; therefore, we view the facts in the light most favorable to Alexander, the non-moving party, drawing all reasonable inferences in his favor. See EEOC v. Sears Roebuck & Co., 233 F.3d 432, 436-37 (7th Cir. 2000). Alexander, who is African-American, was hired by the Department in February 1992, as a Food Service Worker at the Central Wisconsin Center (the "Center"), a care center for developmentally disabled residents, and worked there until his termination in December 1996. His claims arise from three separate incidents at the Center that resulted in his being subjected to disciplinary action including a five-day suspension, a ten-day suspension, and his eventual termination.

The first of these incidents occurred on August 3, 1995. Alexander was working at the Center in the kitchen area and recalls that it was a very hot day and he was not feeling well. He mentioned to several of his co-workers, including Randy Severin, that he felt dizzy and faint. Severin, who in Alexander's presence had previously referred to African-Americans as "niggers," responded by suggesting something to the effect of "if you are not feeling well, why don't you fucking go home?" Alexander became upset with Severin and the two men exchanged heated words. However, when his supervisor, Paul Scallon, told him to sit down and cool down, Alexander complied by taking a chair and sitting approximately fifteen feet away from Severin. Alexander acknowledges that he was very upset with Severin and that he continued to look at him. Severin then left that area of the kitchen.

Scallon reported the incident to Susan Moritz, Administrator of the Food Service Department at the Center. As an administrator, Mortiz's duties included: hiring, disciplining, and terminating employees; enforcing Department policies and procedures; and supervising food service supervisors and employees. Moritz investigated the incident and arranged a pre-disciplinary meeting with Alexander to discuss the altercation. Following this meeting, Alexander was given a five-day suspension because Moritz believed that he was the aggressor in the incident. Severin was not disciplined.

In February 1996, Alexander asked Moritz if the two of them could meet with Donna Carlson, a unit supervisor Alexander believed was harassing him. Moritz told Alexander to make a list of his allegations with specific issues and dates and that she would set up the meeting thereafter. Alexander never compiled any such list and no meeting was scheduled. Moritz has acknowledged that it is not her usual practice to require an employee to submit such written documentation before an informal meeting.

The second incident for which Alexander was disciplined took place approximately seven months later on February 29, 1996. According to Alexander, his primary responsibility at work that day was to stack trays coming off the tray line in the kitchen area. The tray line was particularly busy, and there was no time for Alexander to step away from the line in order to strap tray carts, another aspect of his job. Whenever the tray line momentarily stopped, however, Alexander used that time to strap carts. Alexander strapped approximately seven carts that were taken downstairs by his co-worker, Jalene Roth, before his supervisor, Donna Carlson, arrived in the area of the line. Carlson's visit to the tray line area of the kitchen was prompted by a report that Alexander was not doing his job. When she arrived, Alexander was working on the tray line, and it was obvious that the line was operating too quickly. Despite the fact that Alexander was busy working, and other employees were available to help strap carts, Alexander contends that Carlson singled him out, criticized him for not strapping carts, and accused him of not doing his job.

Alexander says that he asked Carlson to help, by saying something to the effect of "Can't you help strap some carts?" Although Alexander insists that his statement was a good faith request for assistance, Carlson responded to Alexander's request by shouting at him, yelling that strapping carts was his job, not hers, and that he had better strap carts right away, or else it would be insubordination. Alexander claims that he continued to remove trays from the line to keep it from stopping, but that as soon as it did stop, he began to strap the cart closest to him. This was not fast enough for Carlson, however, and she

sent Alexander home for insubordination.

Carlson reported the incident to Moritz, who investigated the exchange and held a pre-disciplinary meeting on March 4, 1996. Sandra Bohling and Jalene Roth, both of whom were union representatives and witnesses to the incident, accompanied Alexander to the meeting, along with a lawyer from the NAACP, and department affirmative action officer Robert Bentley. Moritz asked George Bancroft, the Director of Institution Management Services, and Robin Gruchow, the Center's personnel specialist, to attend the meeting. At the meeting, Alexander denied any wrongdoing, and Bohling and Roth expressed their view that Alexander had been mistreated by Carlson. Moritz concluded, however, that Carlson's description of the incident was more credible, and she recommended that Alexander be disciplined. Alexander subsequently received a ten-day suspension without pay.

On the same day as the pre-disciplinary meeting, Alexander filed an informal complaint with Bentley, alleging that Carlson and Moritz discriminated against him on the basis of race. In his complaint, Alexander listed fourteen different acts that he considered to be evidence of racial discrimination. Following up on Alexander's complaint, Bentley sent written questionnaires regarding the allegations to Carlson and Moritz in April and May of 1996. Carlson was also given the option of answering the questionnaire in person. Carlson showed the questionnaire to Brian Fancher, the human resources director at the Center, seeking advice in how to respond. Fancher reviewed the questionnaire and became concerned because he considered the questions to be hostile and somewhat accusatory. He also thought it was unusual for an affirmative action officer to use written questionnaires as opposed to conducting personal interviews. Gruchow also believed that Bentley's investigation procedure was unusual. Fancher approached Bentley to discuss the manner in which he was investigating Alexander's complaint. In response to Fancher's inquiry, Bentley asked Fancher to put any questions he had about the investigation in writing along with an explanation of his need to know the answer to those questions.

Thereafter, Fancher sought guidance on how to proceed from Department Administration, and he instructed Moritz and Carlson to wait to answer the questionnaires until he received a response. Bentley concluded his investigation before Fancher received any directive, however, and Bentley's report was completed without input from Carlson or Moritz.

Bentley submitted the results of his investigation to division administrator, Tom Alt, in a memorandum dated June 26, 1996. His report indicated that he believed that Alexander had been subjected to harassing behavior and he recommended that disciplinary action be taken against Carlson and Moritz for their treatment of Alexander. No such action was taken, however, because the department concluded that the lack of input from Carlson and Moritz rendered the report incomplete and therefore unreliable.

On October 9, 1996, Alexander filed a charge of discrimination with the Wisconsin Personnel Commission, alleging that he was subjected to discrimination and harassment at the Center because of his race. The complaint was cross-filed with the EEOC and Alexander received a right to sue letter. The Department learned of the complaint on October 23, 1996.

The third and final incident that led to Alexander's termination took place eight months later on October 24, 1996. Melodie Stumpf, a co-worker of Alexander, accused him of making a throat-slashing gesture at her while passing her in the hall at work. Alexander does not remember passing Stumpf in the hall at work and contends that if he did, he did not say anything to her or make any gestures towards her. Stumpf reported the alleged incident to Claire Nagel, who informed Moritz. Moritz contacted Gruchow, who called Alexander to the personnel office. According to Alexander, Gruchow informed him that he had been accused of making a throat-slashing gesture and placed him on paid administrative leave.

On October 30, 1996, Alexander, Alexander's wife, Bohling, Bancroft, Gruchow, and Moritz attended an investigatory meeting. Alexander denied

knowing anything about any threat toward Stumpf, but stated that he knew he was accused of making a throat-slashing gesture because Gruchow had told him as much on October 24. Gruchow denied Alexander's assertion, explaining that Alexander knew and described the exact manner of the alleged gesture even though he had never told Alexander the full details of the accusation.

Prior to this incident, Moritz had met with Alexander and Stumpf, at Alexander's request, to discuss claims Stumpf had made that Alexander was staring at her in the workplace. At that meeting Stumpf agreed she would let Alexander know when she was unhappy with some aspect of his behavior. Bohling had warned Moritz at that time that Stumpf and other co-workers were intent on harassing Alexander with false accusations.

Bohling reiterated this point to Moritz and Gruchow at the investigatory meeting. She also noted that Alexander frequently touched his beard guard at his throat while working, and suggested that Stumpf may have seen Alexander adjusting his beard guard and misconstrued it as a throat-slashing gesture.

Gruchow scheduled a meeting with Alexander for December 9, to review his discipline, but Alexander canceled because of car trouble and illness. The meeting was rescheduled for December 10 and then December 11, but Alexander canceled for the same reasons. Gruchow spoke with Alexander's doctor, but the doctor did not provide Gruchow with a medical excuse. Alexander did have an excuse from his doctor but did not give it to defendants at that time. Gruchow then sent Alexander a letter asking him to respond to the investigation in writing and Alexander complied.

Alexander was terminated on December 17, 1996, because management believed Stumpf's account of the throat-slashing incident and that Alexander was lying. Management doubted Alexander's credibility because Alexander knew that he had been accused of making a throat-slashing gesture without having been told so by Gruchow and because there had been a long history of Alexander confronting his co-workers. Because Alexander had previously received a five-day and then a

ten-day suspension, termination was the next step required by the Department's progressive discipline program.

Alexander filed suit in the Circuit Court of Dane County, Wisconsin, and the defendants removed the action to the United States District Court for the Western District of Wisconsin. Alexander filed an amended complaint in the district court seeking declaratory and injunctive relief for unlawful race discrimination and retaliation by the Department in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000 et seq., stemming from his ten-day suspension and eventual termination./1 Alexander also raised claims under 42 U.S.C. sec.sec. 1981 and 1983, alleging that Moritz, Carlson, and Gruchow discriminated against him and denied him due process through their involvement in his suspensions and termination. The defendants filed a motion for summary judgment on all of Alexander's claims. The district court granted the defendants' motion, finding that Alexander failed to produce any evidence indicating that the stated reasons for his adverse employment actions were pretext for discrimination or retaliation. See Alexander v. Wis. Dep't of Health & Soc. Servs., No. 99-C-0429-C, slip op. at 21 (W.D. Wis. May 23, 2000). The court also found that in all three instances, the process by which Alexander's discipline was determined did not violate his due process rights. See id. at 29-31. Alexander now appeals.

II.  Analysis

A.  Standard of Review

We review a district court's decision to grant a motion for summary judgment de novo. See Russell v. Bd. of Trs. of the Univ. of Ill. at Chi., 243 F.3d 336, 340 (7th Cir. 2001). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A genuine issue of material fact exists "only if

there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Baron v. City of Highland Park, 195 F.3d 333, 338 (7th Cir. 1999) (citing Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). As explained above, when making this determination, we review the record in the light most favorable to Alexander and draw all reasonable inferences in his favor. See Del Raso v. United States, 244 F.3d 567, 570 (7th Cir. 2001).

We take this opportunity to briefly address our past use of the phrase "added rigor" in employment discrimination cases. The use of this phrase has raised the question of whether we have been reviewing grants of summary judgment in employment discrimination cases under a heightened level of scrutiny. See, e.g., Webb v. Clyde L. Choate Mental Health and Dev. Ctr., 230 F.3d 991, 997 (7th Cir. 2000) ("We apply this standard with added rigor in employment discrimination cases, where intent and credibility are crucial issues."). We first used the phrase "added rigor" in McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368 (7th Cir. 1992), explaining that the summary judgment standard "is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue." Id. at 370-71. In support of this proposition, we cited Stumph v. Thomas & Skinner, Inc., 770 F.2d 93, 97 (7th Cir. 1985) ("'Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles.'") (quoting Pfizer, Inc. v. Int'l Rectifier Corp., 538 F.2d 180, 185 (8th Cir. 1976)), and Visser v. Packer Eng'g Assocs., 924 F.2d 655, 660 (7th Cir. 1991) ("Caution is required in granting summary judgment, especially under a statute that allows for trial by jury, as the age discrimination law does."). Although it is understandable how one might infer from our regular use of this phrase that we meant to communicate a more stringent standard to be used in reviewing employment cases,/2 the original use of this phrase indicates that it was merely included to stress the fact that employment discrimination cases typically involve questions of intent and credibility, issues not appropriate for this court to decide on a review of a

grant of summary judgment. Thus, regardless of our inclusion of the phrase "added rigor" in prior cases, we review a district court's decision to grant a motion for summary judgment on a claim involving issues of employment discrimination as we review any case brought before this court involving the review of a grant of summary judgment. See Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997).

B.  Alexander's Title VII and 42 U.S.C. sec. 1981 Claims

   Alexander appeals the district court's grant of the Department's motion for summary judgment on his Title VII claims, arguing that summary judgment was erroneously granted because he has produced sufficient evidence from which a jury could find that the Department's proffered reasons for his suspension and termination were pretext for discrimination and retaliation. Alexander also challenges the district court's grant of summary judgment on his claim of racial discrimination against Carlson, Moritz, and Gruchow under 42 U.S.C. sec. 1981. Alexander contends that there are sufficient facts in the record from which a jury could infer that Carlson, Moritz, and Gruchow's decisions to discipline and terminate him were racially motivated.

   Title VII explains that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. sec. 2000e-2(a)(1). Similarly, sec. 1981 states that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to the full and equal benefit of the laws . . . as is enjoyed by white citizens." 42 U.S.C. sec. 1981. "Because we analyze sec. 1981 and Title VII discrimination claims in the same manner," Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998); see also Bratton v. Rdway Package Sys., Inc., 77 F.3d 168, 176 (7th Cir. 1996), we will simultaneously review Alexander's claims of racial discrimination against the Department and the three individual defendants. Additionally, because the

parties agree that the only disputed issue with regard to Alexander's claims of discrimination and retaliation is whether the stated reasons for his suspension and termination are pretext, we will consider these claims together.

A plaintiff alleging race discrimination under Title VII and sec. 1981 can prove such discrimination either by providing direct evidence of an employer's discriminatory intent or by showing disparate treatment using indirect evidence and the burden-shifting method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Contreras v. Suncast Corp., 237 F.3d 756, 759 (7th Cir. 2001). Likewise, a claim of retaliation under Title VII can be proven by "either offer[ing] direct evidence of retaliation or proceed[ing] under a burden-shifting approach." Fyfe v. City of Fort Wayne, 241 F.3d 597, 601 (7th Cir. 2001); see also Sanchez v. Henderson, 188 F.3d 740, 745 (7th Cir. 1999) (explaining that "[a] claim for retaliation under Title VII invokes a variant of the familiar McDonnell Douglas burden-shifting framework"). Because Alexander does not present any direct evidence, he must proceed under the burden-shifting methods.

Alexander is required to present sufficient evidence to make out a specific prima facie case for both types of claims. See Contreras, 237 F.3d at 759. In each instance, if a plaintiff successfully makes out a prima facie case, the employer must then present a legitimate, non-discriminatory reason for the allegedly unlawful action. See Stewart v. Henderson, 207 F.3d 374, 376 (7th Cir. 2000); see also Sanchez, 188 F.3d at 746. Once such a reason is presented, the plaintiff must establish by a preponderance of the evidence that the employer's stated reason is merely a pretext for discrimination or retaliation. See Walker v. Glickman, 241 F.3d 884, 889 (7th Cir. 2001); see also Freeman v. Madison Metro. Sch. Dist., 231 F.3d 374, 379 (7th Cir. 2000).

The parties in this case agree that Alexander has made out a prima facie case for his claims of race discrimination and retaliation. They also agree that the Department and the individual defendants have provided legitimate, non-

discriminatory reasons for Alexander's suspensions and his termination. Thus, the sole issue in dispute is whether Alexander can show, by a preponderance of the evidence, that the defendants' stated reasons for suspending and eventually terminating him "were not [their] true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (internal quotation omitted). Therefore, we will turn directly to the issue of pretext.

Alexander may establish that the defendants' offered reasons for suspending and terminating him are pretext for discrimination and retaliation by providing either direct evidence indicating that the defendants were "more likely than not motivated by a discriminatory reason," or indirect evidence showing that the defendants' stated reasons are not credible. Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1039 (7th Cir. 1993) (citations omitted); see also Walker, 241 F.3d at 889. Because he does not present any direct evidence that the defendants' stated reasons for his suspensions and termination were pretext, Alexander must rely on indirect evidence. "Creating a triable pretext issue with indirect evidence is a difficult task which may be accomplished in one of two ways." Guerrero v. Ashcroft, 253 F.3d 309, 313 (7th Cir. 2001). Alexander must show either that the defendants lied about why they took the adverse action that they did or that the defendants' stated reasons for his suspensions and termination have no basis in fact. See id. Additionally, we recognize that "we are not a super-personnel board and that we may not punish an employer for choices that constitute business decisions alone, no matter how unwise or mistaken they may seem to us." Id. at 314 (citing Reeves, 530 U.S. at 144). That having been said, however, when reviewing a grant of summary judgment, the only question before us is whether the plaintiff has provided evidence from which a rational trier of fact could infer that the employer's stated reasons for taking the adverse action were lies. See Bell v. E.P.A, 232 F.3d 546, 550 (7th Cir. 2000). "'If the only reason an employer offers for [taking adverse action against] an

employee is a lie, the inference that the real reason was a forbidden one . . . may reasonably be drawn. This is the common sense behind McDonnell Douglas.'" Id. (quoting Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994)). Thus, "'[b]ecause a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes summary judgment.'" Id. (quoting Perdomo v. Browner, 67 F.3d 140, 145 (7th Cir. 1995)).

The district court correctly observed that Alexander "has proffered ample evidence that several of his co-workers were bigots and that their bigotry made his work environment extremely difficult." Alexander v. Wis. Dep't of Health & Soc. Servs., No. 99-C-0429-C, slip op. at 21 (W.D. Wis. May 23, 2000)./3 Furthermore, the seeming lack of commitment by the Department to prevent or respond to this insensitive behavior in any meaningful manner is troubling; hopefully the Department recognizes that the behavior exhibited by Alexander's co-workers--state employees no less--is unacceptable. Notwithstanding the behavior of several of Alexander's co-workers, however, we agree with the district court's determination that Alexander "has offered no evidence that the disciplinary measures he is challenging were motivated by his race or by his complaints of discrimination rather than by defendant[s'] legitimate belief that such discipline was justified by Alexander's conduct." Alexander, slip op. at 21.

1. Five-Day Suspension

Alexander's five-day suspension resulted from the confrontation between Alexander and his co-worker Randy Severin that took place on August 3, 1995. Alexander describes the incident as an angry altercation in which both men were equally aggressive and equally at fault, but for which Moritz and Gruchow subjected him to a suspension without pay and did not discipline Severin.

Alexander claims that Moritz, Carlson, and Gruchow's involvement in this adverse employment action constitute discrimination in violation of 42 U.S.C. sec. 1981. We first note that Alexander

provides no facts indicating that either Carlson or Gruchow were involved in any capacity with the decision to suspend him. Thus, no further discussion is necessary regarding Carlson and Gruchow; we affirm the district court's grant of summary judgment as to these two individuals on this claim. With regard to Moritz, Alexander alleges that her decision to discipline him was racially motivated and that her stated reason for this decision was a pretext for said discrimination. Alexander contends that the fact that he received such a severe penalty while Severin was not disciplined supports his claim of pretext.

Moritz's stated reason for suspending Alexander was that she believed he had disobeyed Scallon's orders and behaved in a threatening manner toward Severin. Scallon, who described the exchange between Severin and Alexander much differently than Alexander, explained that after he called everyone back to the tray line from a break, Severin wanted to begin working on the tray line immediately. Alexander saw this and deliberately slowed down, asking if he could get a drink of water. Scallon allowed Alexander to get a drink but urged him to do so quickly. When Severin saw this, he asked "why can't we get going?" Scallon recalls that Alexander replied: "I'm not gonna take that shit from a white punk!" Alexander and Severin exchanged heated words and Scallon told them both to be quiet. Scallon reported that Alexander was the aggressor in this confrontation and that Alexander disregarded Scallon's repeated orders to go to a different part of the kitchen, so as to end the confrontation. Instead, Alexander placed a chair very close to Severin, sat down, and stared at him. Scallon indicated that several of the other workers in the kitchen area began to cry and seemed concerned about what Alexander would do next. The confrontation finally ended when Severin moved to a different section of the kitchen, although Alexander continued to stare at Severin for the rest of the time they worked on the tray line. Scallon also noted that later that day he saw Alexander walking away from Severin's car, and that Severin told him that Alexander was taunting him. After hearing Scallon and Alexander's description of the confrontation, Moritz recommended

that Alexander be disciplined.

Even though we accept Alexander's version of his confrontation with Severin, as we must, we still find that Alexander has failed to show any evidence from which a rational trier of fact could infer that Moritz's stated reason for the suspension was pretext for discrimination. Moritz made her decision to discipline Alexander based on Scallon's description of the exchange between Severin and Alexander. While "[s]ummary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action," Eiland, 150 F.3d at 752 n.1 (quoting Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1459 (7th Cir. 1994)), Alexander has presented no such evidence regarding Scallon. Additionally, although the evidence Alexander has offered regarding Moritz, reviewed in the light most favorable to Alexander, might indicate that Moritz could have been more responsive to some of the insensitive comments made by Alexander's co-workers, Alexander has not shown that Moritz had a discriminatory animus towards him that tainted her assessment of the confrontation between Alexander and Severin.

Furthermore, Alexander has presented no evidence that a five-day suspension is unusually severe for his conduct as it was described to Moritz by Scallon. While Alexander correctly notes that in 1990, two white employees who engaged in a physical confrontation did not receive the same level of discipline as Alexander did in this instance, it is undisputed that the Department had, subsequent to the 1990 incident, formulated a more stringent policy regarding violence in the workplace. Therefore, we find that Alexander has failed to show that Moritz's stated reason for suspending him for five days was pretext for discrimination.

2.  Ten-Day Suspension

The incident that led to Alexander's ten-day suspension took place on February 29, 1996. Alexander claims that Carlson singled him out by falsely accusing him of not doing his job and unfairly

reprimanding him for insubordination. Alexander further contends that Moritz and Gruchow conducted a sham investigation and pre-disciplinary meeting before subjecting him to a penalty that he alleges is the harshest in Department history for an incident of insubordination. Alexander argues that these actions were the result of race discrimination and retaliation by the Department and race discrimination on the part of Moritz, Carlson, and Gruchow, and that the defendants' stated reason for this suspension was pretext for discrimination and retaliation.

The defendants' stated reason for Alexander's ten-day suspension was that Alexander had been insubordinate to his supervisor, Carlson, following his previous five-day suspension. On the day of the incident, Carlson received a report that Alexander was not doing his job. When she went to check out the veracity of this report, Carlson observed that Alexander had not strapped any carts, even when there was a lull in the tray line. Carlson told Alexander that he needed to start strapping carts. According to Carlson, Alexander responded to this instruction by laughing and sticking his tongue out at her. Carlson again directed Alexander to strap carts, to which Alexander suggested "Donna why don't you strap?" Carlson gave a third instruction to begin strapping the tray carts, but Alexander still made no effort to comply. After Alexander failed to comply with her third directive, Carlson told him to leave work. Alexander responded to this instruction by beginning to strap carts; however, Carlson told him that it was too late, and that she wanted him to leave. Carlson reported the incident to Moritz. After hearing Carlson and Alexander's description of what happened, Moritz recommended that Alexander be disciplined.

Moritz's reliance on Carlson's description of the cart strapping incident would not be an acceptable basis for the adverse employment action taken against Alexander if Alexander could show that Carlson harbored racial animus towards him, and that Moritz knew or should have known of Carlson's bias. See Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1459 (7th Cir. 1994) ("Summary

judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action."). Likewise, Alexander could also undermine the defendants' stated reason for his suspension by showing that Moritz herself carried a bias towards Alexander. See id. Alexander has not shown, however, that Carlson's actions reflected a racial animus towards him that Moritz knew or should have known about, or that Moritz herself carried a bias that tainted her role as a decision-maker. The affidavits of Jalene Roth and Sandra Bohling presented by Alexander do not provide evidence indicating that either Carlson or Moritz was racially biased against Alexander. Instead, these affidavits describe their observations of the cart strapping incident and opinions that Alexander was not insubordinate. Moritz heard these opinions, as well as Carlson's description of the exchange in making her decision. Additionally, although the exact phrasing and tone of Alexander's statements to Carlson are disputed, Alexander's own description of his exchange with Carlson acknowledges that instead of complying with Carlson's orders, he suggested to her that she might assist him with his duties.

Alexander has also shown no evidence that his ten-day suspension was unduly harsh. Gruchow, whose duties included handling probationary and permanent employment discipline for the Center, explained that the Department uses a progressive discipline program, and that in most cases, an employee who had already received a five-day suspension would be terminated if any further discipline was necessary. See Gruchow Aff. para. 14. In this instance, instead of being terminated, Alexander received a longer suspension. Thus, because we find that Alexander has failed to show that the Department's stated reason for suspending him for ten days was pretext for racial discrimination, we will affirm the district court's grant of summary judgment on this claim. We likewise find that Alexander has failed to show that Moritz, Carlson, or Gruchow discriminated against him in violation of sec. 1981.

Alexander also claims that the ten-day suspension was an act of retaliation for

his complaining to Moritz about Carlson and other workplace discrimination and that the Department's stated reason for his suspension was pretext for this retaliation. We cannot agree. Alexander has presented no evidence from which it can be inferred that the Department's stated explanation that Alexander wasdisciplined because he was found to have been insubordinate was in any way pretext for an act of retaliation against Alexander for his having complained about Carlson and other racial discrimination in the workplace. Therefore, we will affirm the district court's grant of summary judgment on Alexander's claim that the ten-day suspension was an act of retaliation.

## 3. Termination

Alexander was terminated after he allegedly made a throat-slashing gesture at co-worker Melodie Stumpf while passing her in the hall at work on October 24, 1996. Alexander contends that he does not remember passing Stumpf in the hall at work, and that if he did, he did not say anything to her or make any gestures towards her. According to Alexander, Gruchow informed him that he had been ac cused of making a throat-slashing gesture towards Stumpf, but later set up Alexander by denying ever having explained the gesture to Alexander and insisting that Alexander knew the exact manner of the alleged gesture without having been told the full details of the accusation. Alexander now argues that Moritz and Gruchow conducted a sham investigation to build a false case for his termination because of his race and the fact that he filed a complaint, and that the defendants' stated reason for his termination was a pretext for that discrimination and retaliation.

The Department's stated reason for Alexander's termination was that Moritz and Gruchow believed Alexander had made a threatening gesture towards Stumpf and then lied about the incident. Management believed that Alexander's denial of the incident was not credible because Alexander knew that he had been accused of making a throat-slashing gesture without having been told so by Gruchow and because there was a documented history of confrontations initiated by Alexander against his co-workers. Because

Alexander had already received a five-day and ten-day suspension, termination was the next step in progressive discipline.

Alexander has presented no evidence from which it can be inferred that the defendants' stated reason for his termination was a pretext for discrimination. Gruchow explained to Moritz that despite the fact that he had been careful not to relay any of the specific details of the alleged gesture to Alexander when he spoke with him on October 24, Alexander called him on October 25 and knew that he had been accused of making a throat-slashing gesture. Although Alexander maintains that Gruchow told him about the gesture and then lied about it, he has made no attempt to produce any evidence indicating any discriminatory animus or bias on the part of Gruchow that would render Moritz's reliance on Gruchow's explanation improper.

Alexander offers Bentley's report in support of his accusation that the defendants' stated reason for his termination was pretext for race discrimination. Bentley's report concluded that the discrimination alleged by Alexander was "likely to have occurred" and recommended that Moritz and Carlson be disciplined. Thomas Alt, Division Administrator of the Department, discussed Bentley's report and recommendation with Gladys Benavides, who at that time was the Acting Director of the Department's Office of Affirmative Action/Civil Rights Compliance ("AA/CRC"). Because the report was compiled without any input from Moritz or Carlson, Alt concluded that it was incomplete and decided not to take any action.

Let us explain very plainly that an entity cannot undermine the system it has put in place to investigate and remedy problems like discrimination in the workplace in order to escape liability for such discrimination. Thus, if there were evidence that the Department had instructed Fancher to tell Moritz and Carlson not to fill out Bentley's questionnaires so that the Department could later discard the report as being incomplete and one sided, evidence of such an attempt to hamper the investigation of Alexander's claim would

render this case inappropriate for summary judgment. However, that is not what happened in this case. Besides there being no evidence that Fancher's decision to seek guidance from other Department officials was an attempt to interfere with Bentley's investigation, there is likewise no evidence that the determination that the report was unreliable was the result of race discrimination or retaliation. To the contrary, Alt issued a memorandum to Steve Watters, the Interim Director at the Center, directing him to take certain steps to ensure that future investigations were timely, complete, and accurate. Alt instructed Watters to:

Clarify with [Center] management and in particular [Center] personnel management that they are expected to cooperate fully with any Department AA/CRC office staff when they are conducting inquiries and reviews. Should conflicts occur in this process they should cooperate first, then raise issues or concerns with theirsupervisor or facility Director.

Additionally, there is no link between Fancher's decision to seek guidance regarding the nature of Bentley's investigation, thereby delaying Moritz and Carlson's completion of Bentley's questionnaires, and Alt's independent determination that the investigation was not a sufficient basis upon which to take disciplinary action. Thus, Alt's treatment of the report cannot be characterized as evidence of a Department conspiracy to discriminate against Alexander. Therefore, we find that Alexander has shown no evidence that the defendants' stated reason for his termination was mere pretext for race discrimination.

Alexander has likewise provided no evidence suggesting that the stated reason for his termination was pretext for retaliation for his having filed a complaint with the Personnel Commission. In support of his argument, Alexandercorrectly notes that the Department was notified that he had filed a complaint with the Personnel Commission on October 23, 1996, the day before he was suspended. Although the timing of an adverse employment action can be evidence of an act of retaliation, see King v. Preferred Technical Group, 166 F.3d 887,

893 (7th Cir. 1999), Alexander's inability to provide "evidence that any of the actors involved in his suspension (Stumpf, Moritz and Gruchow) had any knowledge of his complaint before his suspension," Alexander v. Wis. Dep't of Health & Soc. Servs., No. 99-C-0429-C, slip op. at 29 (W.D. Wis. May 23, 2000), prevents any such inference to be drawn from the timing of his suspension and eventual termination. Thus, without more, there is no indication that the Department's stated reason for terminating Alexander was pretext for retaliation.

C.  Alexander's sec. 1983 Claim

   Alexander also appeals the district court's grant of summary judgment on his sec. 1983 claim, alleging that Carlson, Moritz, and Gruchow denied him of his right to due process. Although he does not articulate his challenge to the district court's ruling, it appears that Alexander now contends that he provided sufficient evidence from which a jury could conclude that, in all three instances of discipline, he was denied the due process to which he is entitled under the Fourteenth Amendment.

   "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the . . . Fourteenth Amendment." Mathews v. Eldridge, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). For purposes of summary judgment, the individual defendants have conceded that Alexander had the requisite property interest in his continued employment. The Supreme Court has explained that "some form of hearing is required before an individual is finally deprived of a property interest." Id. at 333. Although such a hearing must provide "'the opportunity to be heard at a meaningful time and in a meaningful manner,'" Cooper v. Salazar, 196 F.3d 809, 814 (7th Cir. 1999) (quoting Mathews, 424 U.S. at 333), due process is not a "technical conception with a fixed content unrelated to time, place and circumstances." Mathews, 424 U.S. at 334 (internal quotation omitted). Thus, the precise form and extent of process required in a particular situation will vary from other factual situations. See Soc'y of Lloyd's

v. Ashenden, 233 F.3d 473, 479 (7th Cir. 2000). We must balance three distinct factors in evaluating the sufficiency of the procedural process provided to Alexander:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.

Gilbert v. Homar, 520 U.S. 924, 931-32, 117 S. Ct. 1807, 138 L. Ed. 2d 120 (1997) (internal quotation omitted).

We again note, as we did with Alexander's sec. 1981 claim, that Alexander has set forth no facts indicating that Carlson and Gruchow were involved with the process by which Alexander was suspended for five days. Carlson waslikewise uninvolved in any capacity with the incident that lead to Alexander's termination. These distinctions are of little consequence, however, as we find that Alexander was provided with adequate procedural due process before each instance of discipline. A pre-disciplinary meeting was conducted by Moritz to discuss and investigate each incident for which Alexander was ultimately disciplined. The record also indicates that Alexander was allowed to explain his version of each incident to Moritz and to present witnesses to support his denials of wrongdoing. Furthermore, Alexander was able to have family members, union representatives, and outside legal advisors accompany him to these meetings. Finally, as we explained before, Alexander has presented no evidence indicating that Moritz possessed a bias or prejudice towards him that would have caused her to be unable to preside at the pre-disciplinary meetings as an unbiased decision-maker. Thus, her participation did not violate his right to due process. See Withrow v. Larkin, 421 U.S. 35, 46, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975) ("Not only is a biased decision-maker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness.") (internal quotation omitted). Thus, we will affirm the

district court's decision granting the individual defendants' motion for summary judgment on this claim.

III.  Conclusion

   For the abovementioned reasons, we AFFIRM the district court's decision to grant the defendants' motion for summary judgment.

FOOTNOTES

/1 A person claiming discrimination under Title VII is required to file a complaint with either the EEOC or a State Personnel Commission within 300 days of the alleged discrimination. See 42 U.S.C. sec. 2000e-5(e). Alexander filed his complaint with the Wisconsin Personnel Commission on October 9, 1996. In his brief opposing defendants' motion for summary judgment, Alexander conceded that he did not purport to state a claim under Title VII for any incident occurring more than 300 days prior to October 9, 1996. Thus, he does not seek relief under Title VII for the five-day suspension he received in August 1995.

/2 A review of our cases reveals that we have used this "added rigor" phrase in some thirty published opinions involving issues of employment discrimination since McCoy.

/3 Evidence of this bigotry included such comments as: "black people don't like to work," "rap music is jungle bunny music," and "blacks should still be slaves." Additionally, State of Wisconsin employees discussed the possibility of attending an African-American wedding covered in shoe polish and suggested to Alexander that his appearance resembled that of a picture of a bulldog and a newspaper photograph of an orangutan.