In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-3003

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GLOBAL DISTRIBUTORS, INC.,
and JOHN ASOOFI,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 7992—**Blanche M. Manning**, *Judge.*

ARGUED FEBRUARY 14, 2007—DECIDED AUGUST 17, 2007

Before MANION, WOOD, and EVANS, *Circuit Judges.*

WOOD, *Circuit Judge.* Global Distributors, Inc., ("Global") made eight large sales of Release, a cold medicine containing pseudoephedrine, to four businesses in Florida in the summer of 1999. The pseudoephedrine was converted into almost a half million dollars' worth of methamphetamine. The government brought a civil action against Global and John Asoofi, the owner and sole shareholder of Global, for failing to demand proof of identity from these four customers as required by the Comprehensive Drug Abuse Prevention Control Act of 1970. The district court ordered summary judgment in favor of the government and assessed the maximum

$25,000 fine per violation jointly against Global and Asoofi for each of the eight violations.

Global and Asoofi challenge the district court's grant of summary judgment to the government, claiming that the evidence did not show unequivocally that they had failed to comply with the statute and its underlying regulations. They also challenge the court's imposition of the maximum civil penalty against them. We agree with the district court that summary judgment for the government was required, but we remand for reconsideration of the amount of fines to which the defendants should be subjected.

## I

John Asoofi owns and operates Global Distributors, Inc., which sells household products to local retail stores for consumer sale. One of these products is the cold medicine Release. The active ingredient in Release is pseudoephedrine, which is a chemical regulated by the U.S. Drug Enforcement Administration ("the DEA") because it can be used to produce methamphetamine. Global was registered and licensed with the DEA to distribute products containing pseudoephedrine; Asoofi obtained that license on Global's behalf.

The Comprehensive Drug Abuse Prevention Control Act ("the Drug Abuse Act") requires distributors of pseudoephedrine to obtain and record the identity of each party to whom they sell the chemical. 21 U.S.C. §§ 827, 830. These records must be available for inspection by DEA officials. *Id.* In 1999, the DEA began investigating Global's sales of Release. The records that Global produced for the DEA showed eight sales in June and July of 1999 of Release to four customers in Fort Myers, Florida: Last Call, Last Call Liquor, Texaco Mart, and Back Bay Market.

Each sale involved more than 25,000 Release tablets, which is above the sales amount that triggers compliance with the Drug Abuse Act.

Global's records did not meet the DEA's requirements, as they did not show that Global had obtained proof of identity of these four customers before making the 1999 sales. Asoofi tried to explain the problem in several ways. He claimed that he did not know proof of identity was required. He also claimed that a former Global sales representative, Naser Ali, had been responsible for the sales at issue. Regardless of where the truth lay, the DEA's investigation showed that much of the Release that Global sold to these four customers in 1999 made its way into the illegal drug market through an individual named Khaled Fatayer, a clerk at Last Call Liquor. Fatayer was making purchases under the name of Last Call Liquor, unbeknownst to the business's owner; he also arranged to receive the Release (for which he paid cash) at Back Bay Market.

In 2002, the government brought this action against Global; later, it added Asoofi as a defendant. It claimed that both had violated Title II of the Drug Abuse Act, the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*, which sets out a regulated person's obligations in ensuring and recording purchasers' identities before a sale of a controlled chemical is completed. In August 2005, the district court granted the government's motion for summary judgment.

## II

We review a district court's decision to grant summary judgment *de novo. Alexander v. Wis. Dep't of Health and Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001). At the outset, it is important to define exactly what requirements the Controlled Substances Act ("the Act") and its

underlying regulations impose on Global and Asoofi. The Act makes it illegal for "a regulated person to engage in a regulated transaction without obtaining the identification required." 21 U.S.C. § 842(a)(9). Global is a "regulated person" under the Act because it distributes a listed chemical (pseudoephedrine) in quantities above the threshold established by the statute. 21 U.S.C. §§ 802(34), (38). Asoofi, as Global's owner and agent, is also a "regulated person" and subject to the Act. *Id.* at § 802(3).

The "identification required" is further defined by the Controlled Substances Act as requiring a "[r]ecord of regulated transactions," which includes specific obligations for the "regulated person." 21 U.S.C. § 830(a). Specifically,

> [i]t is the duty of each regulated person who engages in a regulated transaction to identify each other party to the transaction. It is the duty of such other party to present proof of identity to the regulated person. The Attorney General shall specify by regulation the types of documents and other evidence that constitute proof of identity for purposes of this paragraph.

21 U.S.C. § 830(a)(3). The Act's regulations address proof of identity in detail:

> (a) *Each regulated person who engages in a regulated transaction must identify the other party to the transaction. For domestic transaction, this shall be accomplished by having the other party present documents which would verify the identity, or registration status if a registrant, of the other party to the regulated person at the time the order is placed.* For export transactions, this shall be accomplished by good faith inquiry through reasonably available research documents or publicly available information which would indicate the existence of the foreign customer. No proof of identity is required for foreign suppliers.

(b) *The regulated person must verify the existence and apparent validity of a business entity ordering a listed chemical, tableting machine or encapsulating machine. For domestic transactions, this may be accomplished by such methods as checking the telephone directory, the local credit bureau, the local Chamber of Commerce or the local Better Business Bureau, or, if the business entity is a registrant, by verification of the registration.* For export transactions, a good faith inquiry to verify the existence and apparent validity of a foreign business entity may be accomplished by such methods as verifying the business telephone listing through international telephone information, the firm's listing in international or foreign national chemical directories or other commerce directories or trade publications, confirmation through foreign subsidiaries of the U.S. regulated person, verification through the country of destination's embassy Commercial Attache, or official documents provided by the purchaser which confirm the existence and apparent validity of the business entity.

(c) *When transacting business with a new representative of a firm, the regulated person must verify the claimed agency status of the representative.*

(d) *For sales to individuals or cash purchasers, the type of documents and other evidence of proof must consist of at least a signature of the purchaser, a driver's license and one other form of identification.* Any exports to individuals or exports paid in cash are suspect and should be handled as such. For such exports, the regulated person shall diligently obtain from the purchaser or independently seek to confirm clear documentation which proves the person is properly identified such as through foreign identity documents, driver's license, passport information and

photograph, etc. Any regulated person who fails to adequately prove the identity of the other party to the transaction may be subject to the specific penalties provided for violations of law related to regulated transactions in listed chemicals.

(e) *For a new customer who is not an individual or cash customer, the regulated person shall establish the identity of the authorized purchasing agent or agents and have on file that person's signature, electronic password, or other identification.* Once the authorized purchasing agent has been established, the agent list may be updated annually rather than on each order. *The regulated person must ensure that shipments are not made unless the order is placed by an authorized agent of record.*

(f) With respect to electronic orders, the identity of the purchaser shall consist of a computer password, identification number or some other means of identification consistent with electronic orders and with § 1310.07(e).

21 C.F.R. § 1310.07 (emphasis added). We furnish the regulations in full here because the defendants cite only to bits and pieces of them, leaving an inaccurate picture of their obligations. The government also fails to set out with any specificity what the regulations require Global and Asoofi to do for each of the customers at issue here.

Although the government might have helped this court more if it had spent less time addressing defenses that Global and Asoofi have jettisoned in this court and more analyzing the regulation, our review is of course *de novo.* We think it most useful to identify Global's specific obligations under the Controlled Substances Act and its regulations, and then to compare those obligations with Global's actions in the eight sales at issue here.

Under 21 C.F.R. § 1310.07(a), Global was required to "identify the other party to the transaction." Because the transactions were domestic, "this shall be accomplished by having the other party present documents which would verify the identity, or registration status if a registrant, of the other party to the regulated person at the time the order is placed." *Id.* Global and Asoofi have presented no evidence that the buyers of Release in the eight transactions at issue presented any documents verifying their identities or registration statuses at the time of their orders. This alone is a violation of the identity regulations and the Act.

The next requirement in the regulations required Global to "verify the existence and apparent validity of a business entity ordering a listed chemical." 21 C.F.R. § 1310.07(b). The regulation offers a number of ways to accomplish this task, including "by such methods as checking the telephone directory, the local credit bureau, the local Chamber of Commerce or the local Better Business Bureau, or, if the business entity is a registrant, by verification of the registration." Global claims that it verified business entities' identities "either by checking an internet telephone directory or by a phone call directly to the business." In a footnote, Global says that it "also obtained some information about the business addresses and contact information from Naser Ali [a former employee of Global], who had arranged for the sales." As evidence of its verifications, Global offers Asoofi's affidavit and a "printout of sample internet phone book listing for Back Bay Market," one of the four customers in the eight transactions at issue.

Even if one telephone call to a number furnished by the customer could suffice for verification of identity under the regulation, no evidence of such a telephone call exists here. The printouts that Global proffered, printed well after this litigation began, provide no evidence that those

listings existed at the time of its contested sales or that anyone at Global ever saw them. Moreover, Global does not state which customers' numbers it looked up in a telephone directory and which ones it called.

Asoofi's affidavit, the other possible evidence of compliance, stated that prior to shipping any orders via Airborne Express, "the information that was furnished by Ali was rechecked. It was unusually [sic] rechecked by using internet yellow pages." Although testimony alone can defeat summary judgment motions in some cases, asserting a conclusion is no substitute for detail where detail is needed to support a claim. See *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001). In *Albiero*, the party opposing summary judgment "put[ ] forth only his own affidavit that no violations existed . . . based not on a personal [knowledge] but on a policy." *Id.* This is exactly what Asoofi has done here, and it is not sufficient. See also *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (holding that Rule 56 "requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted").

Global does not address 21 C.F.R. § 1310.07(c), which requires a regulated person to "verify the claimed agency status of the representative" when it is "transacting business with a new representative of a firm." For one of the four customers at issue, Texaco Mart, Global states that Lisa Lawson was the agent placing the orders and was in fact the store manager. But Global does not provide any evidence that it verified this fact prior to the government's lawsuit. Global notes that it had an alleged practice of obtaining a signature from an agent when making a delivery, but this tells us nothing about how or when the status of the agent was verified.

Both the government and the defendants also pay little heed to 21 C.F.R. § 1310.07(d). This regulation applies

to sales to "cash purchasers," and requires "at least a signature of the purchaser, a driver's license and one other form of identification." In the government's summary judgment motion and its statement of facts to this court, the government alleges that the deliveries to Back Bay Market were "paid for . . . in cash." Global and Asoofi appear to concede that this is true. All they have to prove the delivery, however, is a signature on the Airborne Express receipt. This falls short of subpart (d)'s requirement of a signature plus two forms of identification.

Finally, defendants were required to comply with 21 C.F.R. § 1310.07(e). (Section 1310.07(f) of the regulations does not apply to this case because the sales were not electronic.) It is not entirely clear from the record whether the customers at issue here were new customers, but because Global and Asoofi claim compliance with § 1310.07(e), we can infer that they were. This regulation applies to transactions with new customers who are not "an individual or cash customer." For those customers, "the regulated person" must "establish the identity of the authorized purchasing agent or agents and have on file that person's signature, electronic password, or other identification." *Id.* Importantly, "[t]he regulated person must ensure that shipments are not made unless the order is placed by an authorized agent of record." *Id.* Again, the only record of signatures that the defendants have on file comes from the Airborne Express receipts; there is no evidence that the defendants conducted any other identity checks to ensure that the agents were who they say they were. The Airborne Express receipts obviously were not obtained before the shipments were made, despite the fact that the regulations make the timing an important factor. See § 1310.07(e). Defendants therefore failed to comply with this regulation section as well.

**III**

The defendants also challenge the district court's imposition of the maximum allowable monetary penalties under the statute. We review the assessment of civil penalties under the Controlled Substances Act for abuse of discretion. *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 398 (2d Cir. 2004). Abuse of discretion is found "only if the district court relied on clearly erroneous findings of fact or made an error in its construction or application of relevant law." *Id.*

The district court relied on the Second Circuit's approach to this issue, *Advance*, 391 F.3d at 377. We, too, find the way that the *Advance* court structured its analysis to be helpful. In *Advance*, the court held that a district court may consider "a number of factors" in assessing a civil penalty, including: "(1) the level of defendant's culpability, (2) the public harm caused by the violations, (3) defendant's profits from the violations, and (4) defendant's ability to pay a penalty." *Advance*, 391 F.3d at 399.

Although the district court gave Global an opportunity to file a memorandum on damages, and Global availed itself of that option, Global did not "challenge[ ] the arguments in the government's damages memorandum." Instead, it continued to present excuses for its underlying behavior. The district court thus took as undisputed the facts in the government's memorandum and drew inferences from those facts. It found that the defendants "knew about the reporting requirements and chose not to follow them, then tried to plead ignorance . . . [then] changed essential facts in [their] story." These findings are supported by the record that was before the court. We agree with the court that they give rise to an inference of culpability.

The defendants argue that Asoofi's culpability "if it exists at all" is significantly removed from the ultimate

social harm his actions caused. The defendants allege that "each of [the] challenged sales . . . was to undoubtedly legitimate businesses." Defendants also argue that imperfect record-keeping in only eight instances is not "indicative of the manner in which Asoofi operated his business" and that the sales were not made in order to "knowingly divert[ ] legitimate medicine for illicit purposes." These arguments are unpersuasive. Sales to at least two of the four customers were made to allegedly unauthorized agents, which Global would have discovered had it met its most basic obligations under the regulations. Thus, even though only a small number of sales are at issue in this case, the district court did not err in its conclusions about the defendants' culpability.

The district court was concerned about the harm this pseudoephedrine would cause in in the illegal methamphetamine market. This is a serious point, which defendants do not address effectively, presumably because they would like to avoid the fact that precisely the risk that the regulations were designed to avert came about here: a significant amount of the Release made its way into that illicit market. As the district court stated, the Release at issue in this case was converted into "almost half a million dollars' worth of methamphetamine." This factor cuts in favor of a stiff penalty, because the controlled substances made their way into the hands of unauthorized users and significantly endangered the public. The defendants' compliance with the regulations would presumably have prevented much, if not all, of this harm.

The third factor is the amount of profits that Global made from the contested sales. The district court found that "Global received $11,000 for its eight sales" at issue here. Defendants argue that this figure was their gross revenue from the sales; their profit was a much more modest $2000. The $11,000 figure came from the government's damages memo to the district court, which the

defendants failed to challenge in the district court. Whichever number is used, however, the comparison between Global's profit and the $200,000 fine is striking.

In *Advance*, the defendant received a $2 million fine based on about $2 million in profits. *Advance*, 391 F.3d at 400. The *Advance* court did not use any specific formula, nor does any law, regulation, or decision require any particular ratio between civil penalties and profits. In the context of a double jeopardy analysis, the Fourth Circuit has held that a civil penalty cannot be grossly disproportionate to the government's loss where the purpose of the fine is remedial. *Thomas v. Comm'r*, 62 F.3d 97, 100-01 (4th Cir. 1995). Nonetheless, civil penalties ought to bear some relation to the conduct being punished. Although the Release that Global sold produced methamphetamine worth a half million dollars, none of those illegal drugs reached the public. In light of that fact, it is more appropriate in this case to focus on the defendants' profits, rather than the public harm caused by their actions, which was minimal in non-monetary terms. That would suggest that a lower fine would be adequate.

The fourth factor is the defendant's ability to pay the penalty. The district court found that Asoofi "owns real property with an aggregate market value exceeding $2,000,000" and "is the sole shareholder of Global, which did $12,000,000 in business last year [2004]." The district court also relied on Dun & Bradstreet's credit rating of Global as "fair." Asoofi counters with the fact that his real property is encumbered by more than $1 million in loans and mortgages. The government retorts that he has forfeited his right to point this out because Global never objected to the evidence of its ability to pay in the district court. Again, the district court noted the defendants' lack of denials of any of the government's factual assertions in its damages memo. But even assuming that the mortgages and loans should have been considered, Asoofi

still has approximately $900,000 of unencumbered value in his real property, which would give him the ability to pay the $200,000 fine. Further, Asoofi is the sole shareholder of Global, and therefore he was a likely beneficiary of Global's $12,000,000 in business done in 2004. That performance alone would allow Global or Asoofi to pay a $200,000 fine.

Lists of factors like those suggested in *Advance* should not be taken as exclusive, nor did the district court treat it that way. The court also took into account Asoofi's alleged use of false social security numbers and aliases, as well as his changing stories regarding his former employee Ali. The alleged aliases and false social security numbers come from the facts that the district court found were undisputed by defendants. There is less than meets the eye with respect to this evidence, however. Although Asoofi's name was spelled several ways, we suspect that there are many individuals in the United States for whom a credit check would show multiple spellings of their names. Recording of social security numbers by multiple vendors is also prone to inadvertent errors. With no evidence of fraudulent use, the government's list of social security numbers and aliases is entitled to very little weight in determining the appropriate level of the monetary penalties.

Looking at the record on fines as a whole, we are concerned that the district court may not have taken some of the ameliorating factors adequately into account. We emphasize that a focus on Global's profits alone would be equally flawed, since such an approach would ignore the social harm to which its conduct gave rise. While we do not rule out the possibility of justifying a steep penalty for Global and Asoofi's behavior, we conclude that the district court's justification for the penalty imposed here falls short, even under the abuse of discretion standard of review.

**IV**

We AFFIRM the district court's grant of summary judgment for the government, but we REMAND the case for reconsideration of the penalties assessed against the defendants.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*