LaVonne Evelyn CROWE, Plaintiff,

v.

SCHOOL DISTRICT OF WEBSTER, Mark Elliott, David Swingle, Lynn Stromberg, Thomas Harstad, Greg Main, Kenn Johnson, Scott Treichel, Russell Helland and Kevin Whelihan, Defendants.

No. 02–C–0701–C.

United States District Court, W.D. Wisconsin.

Oct. 1, 2003.

Linda L. Harfst, for Plaintiff.

Joel L. Aberg, Weld, Riley, Prenn & Ricci, S.C., Eau Claire, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action, plaintiff LaVonne Crowe contends that defendant School District of Webster violated Title VII of the 1964 Civil Rights Act, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2, by discriminating against her in the terms and conditions of her employ-

ment because of her race. In addition, plaintiff has brought claims against defendants Mark Elliott, David Swingle, Lynn Stromberg, Thomas Harstad, Greg Main, Kenn Johnson, Scott Treichel, Russell Helland and Kevin Whelihan in their individual capacities pursuant to 42 U.S.C. § 1981 and the equal protection clause of the Fourteenth Amendment, as applicable under 42 U.S.C. § 1983, alleging that they discriminated against her because of her race when they terminated her employment and refused her membership in the union. Plaintiff seeks reinstatement in her position in defendants' school district, restoration of benefits and monetary damages, including back pay, lost benefits, punitive damages and compensatory damages. Jurisdiction is present under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4).

Presently before the court are defendants' motion for summary judgment and plaintiff's motions to strike the affidavit of Kathryn Prenn and certain of defendants' proposed findings of fact and conclusions of law. I agree with plaintiff that there is no evidence that Prenn would have personal knowledge of the disputed information. Therefore, I will grant plaintiff's motion to strike paragraphs 2, 3, 5, and 6 of Prenn's affidavit. Because citations for numerous paragraphs in defendants' proposed findings of fact are inadequate or provide insufficient support as required by Fed. R.Civ.P. 56(e) and this court's Procedures for Filing Motions for Summary Judgment, I will grant plaintiff's motion to strike paragraphs 6, 7, 8, 12, 13, 14, 16, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 30, 31, 32, 33, 35, 37–Sentence 2, 39, 40, 50, 54, 55, 56, 60, 62, 63, 65, 68, 69, 70, 71, 81, 82, 83, 92, and 98. I will deny plaintiff's motion to strike paragraph 25 because the citation corresponds to a fact about which the plaintiff would have personal knowledge. As for striking the headings between paragraphs 12 and 13 and paragraphs 71 and 72, I do not consider the headings as proposed findings of fact and therefore will deny this portion of plaintiff's motion as unnecessary.

Because plaintiff has failed to adduce evidence from which a reasonable trier of fact could infer that defendants were motivated to deny plaintiff entry into the union or terminate her because of her race or that defendants' stated reasons had no basis in fact, I will grant defendants' motion for summary judgment.

Before I set out the undisputed facts, a word is necessary regarding defendants' proposed findings of fact. Although I address my concerns about defendants' facts in the context of plaintiff's motions to strike, I have ignored many of defendants' proposed facts because they did not comply with this court's procedures for filing motions for summary judgment. For example, in defendants' proposed finding of fact # 26, defendants cite an exhibit presented at plaintiff's deposition to support the fact that Steven Ojibway wrote defendant Helland a letter. Dfts.' PFOF, dkt. # 17, ¶ 26; see also Dfts.' PFOF, dkt. # 17, ¶¶ 16, 28, 30, 31, 32, 35, 55, 56, 60, 62, and 69. However, defendants cannot use plaintiff's deposition testimony for that purpose. Plaintiff testified only that she was shown the letter after her termination hearing. She did not know whether Ojibway sent the letter or whether defendant Helland received it, read it, or considered it in terminating plaintiff. On numerous occasions, defendants fail to support their motion for summary judgment with admissible evidence. However, even without this evidence, plaintiff's claim still fails.

From the proposed findings of fact and the record, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

Plaintiff LaVonne Crowe is a Native American member of the Menominee Indi-

an Tribe. She has extensive experience in Native American issues. For 13 years, she served as the Milwaukee Public School System Native American Student Advisor under Title IV of the Indian Education Act (an earlier version of Title IX (20 U.S.C. § 7501)). She was a licensed teacher under the State of Wisconsin Department of Public Instruction's American Indian Culture, History, Language Board from 1993 through February 1998 and she was a Wisconsin Tribal History Instructor–Act 31 for the Milwaukee Public School System from 1993, until she resigned in February 1998 to move to Danbury, Wisconsin.

In Danbury, plaintiff applied for a Title IX tutor position with the Webster School District. Defendants Mark Elliott, David Swingle, Lynn Stromberg, Thomas Harstad, Greg Main, Kenn Johnson and Scott Treichel were members of the board of education for the Webster School District at all times relevant to this case. At all times relevant to this case defendants Russell Helland and Kevin Whelihan served as district administrator (superintendent) and a building principal, respectively, for the Webster School District. Defendants Helland and Johnson and members of the Local Indian Education Committee interviewed plaintiff for the Title IX tutor position. Defendant Helland offered plaintiff the position and she began working in August 1998. Plaintiff was the only Native American employed by defendant during the school years 1998–1999 through 2001–2002.

Webster School District is a Wisconsin public school district organized pursuant to Chapter 120 of the Wisconsin Statutes. It employs more than 100 employees. From 1998–2001, the district enrolled about 764 students, 22–25 percent of whom were Native American students. The Title IX tutor job description in effect during plaintiff's employment states in relevant part:

JOB GOALS:

1. To provide academic mentoring and guidance assistance to Native American students in such a manner that encourages their academic improvement where appropriate, and fosters attitudes that encourage students to remain active participants in school until their graduation.

2. To maintain cultural values of the Native American students and instill cultural awareness to the overall student population as well as school staff members.

3. To encourage educational success in all Native American students.

JOB RESPONSIBILITIES—The Title IX Tutor shall:

1. Maintain an active list of Native American students enrolled, their class schedules, their family history, and their 506 forms...

3.... [T]utor Native American students in the classroom setting and individual tutoring when the need arises ...

5. Regularly actively participate in the Local Indian Education Committee meetings ...

7. Encourage Native American students to mainstream in school life and to graduate from high school ...

9. Assist in programs/projects that raise the self-esteem of Native American students ...

12. Attend necessary meetings and workshops to update skills and maintain a line of communication between government agencies (federal, state and county).

13. Attend staffings with other tribal staff person when necessary ...

15. Help identify Native American students who are, or may become, "At Risk" students ...

18. And other duties as assigned by the Building Principals.

Plt.'s PFOF, dkt. # 29, ¶ 35. Plaintiff was originally told that the supervisors for her position included the Local Indian Education Committee and the building principals, such as defendant Whelihan. (The Local Indian Education Committee is an advisory committee to the Local Education Agency and consists of parents, community members, and teacher and student representatives that make recommendations to the Local Education Agency on issues affecting Native American students.) In practice, defendant Helland (district administrator) was very involved in plaintiff's activities. For example, plaintiff could not obtain reimbursement for supplies and travel without Helland's approval.

Plaintiff never received a warning, reprimand, discipline or suspension arising out of her job performance during the two and one-half years she was employed by the district. Defendant Whelihan believes plaintiff made a positive contribution to the district with regard to an in school suspension issue. A group of eleven students, teachers, and grandparents believe plaintiff worked well with the students and was dedicated to her position. For example, one student attributed her graduation from high school to plaintiff's assistance. Another student indicated that plaintiff went out of her way to help her and anyone else who needed assistance. One teacher commented that plaintiff had a greater success rate than previous Title IX tutors in getting students to pay attention. Another teacher found no problems communicating with plaintiff. A district employee thought plaintiff did a commendable job. A grandparent stated that plaintiff had tutored her grandson and now that plaintiff is gone, her grandson is losing interest in school and does not care to go.

A. *Events Leading up to Termination*

Some Native American students in the Webster School District received services from another full-time employee, the John-son O'Malley Coordinator. The Johnson O'Malley Coordinator was an employee of the St. Croix Tribe, not an employee of the district. Sharalanee Taylor served in this position from spring 1999 until she resigned in November 2000. Plaintiff worked with Taylor throughout Taylor's tenure.

Problems between plaintiff and others in the school district began occurring in late 1999. In December 1999, plaintiff recalls Taylor coming into plaintiff's office and accusing her, in front of staff and students, of misrepresenting "506 forms" and stealing. Plaintiff was surprised by the accusations. Later, she received an email stating that a meeting had been scheduled for December 22, 1999 in Helland's office. Plaintiff also received a copy of a letter dated December 17, 1999 written by Taylor to Helland. Taylor characterized plaintiff's behavior as "unprofessional" and described a feeling of animosity between plaintiff and Taylor.

Because plaintiff did not agree with many of Taylor's comments in the letter, she responded with her own letter to Helland dated December 20, 1999, pointing out some unprofessional behavior displayed by Taylor. Defendants Helland and Whelihan were present at the December 22, 1999 meeting, as well as plaintiff, Taylor and two others. The meeting participants discussed Taylor's letter, but not plaintiff's letter, and decided that Taylor and plaintiff should have weekly meetings to try to coordinate their efforts. Although Helland did not respond specifically to plaintiff's letter, he did write on plaintiff's letter "a lot of denial and blaming[;] can review in deliberations." Helland and plaintiff believed that the issue raised by Taylor was resolved after the December 22, 1999 meeting.

Plaintiff wrote memoranda to Helland or Whelihan on several occasions and never

received a response. For example, on March 10, 2000, plaintiff wrote Whelihan to say that she had heard about a rumor floating in the community that she had written a budget for herself and taken Title IX money for herself. Whelihan never responded. On May 19, 2000, plaintiff emailed Helland to indicate her willingness to continue to cooperate with Taylor and to inform Helland that Taylor was not keeping plaintiff informed about some projects. Helland never responded to plaintiff's email. On May 31, 2000, plaintiff wrote Whelihan, offering a suggestion regarding the school's retention policy. No one from the school administration responded to plaintiff's letter. Plaintiff also wrote emails and memoranda to Helland on August 30, 2000 and September 2000 to which she never received a response.

On November 10, 1999, plaintiff attended the Local Indian Education Committee meeting. At the meeting, the committee approved an incentive field trip to Six Flags Great America for the end of the 1999–2000 school year. Helland informed plaintiff that she would have to secure her own funding and transportation for the trip. Plaintiff and a student attempted to secure financial assistance from the St. Croix Tribal Council. When after several attempts the tribal council did not respond to her request for financial assistance, plaintiff wrote a final letter to the St. Croix Tribal Education Director and sent copies to the Council and the Local Indian Education Committee. Plaintiff wrote:

Last year, the elementary students, who maintained a 2.000 were supplied with two [motor] coaches to Wild Mountain amusement park, in St. Croix Falls. The St. Croix Education Department financed that excursion. I think the Junior and Senior High School students deserve the same treatment. I could send letters to Bremer Foundation, Wilder Foundation and the newspapers requesting area businesses to donate some

funds. (In fact, if I do not hear from you by Tuesday, via telephone, I will send a fax to the newspapers. I believe I will have to tell them that I was unable to secure funds from Webster School District and the St. Croix Tribal Council/Education Director.)

Dfts.' PFOF, dkt. # 17, ¶ 25. On or about June 21, 2000, plaintiff received a call at home from Helland asking her to meet with him the following day about working summer hours to do the Performance Report for the Title IX program. On June 22, 2000, Helland and plaintiff met, reviewed the Title IX budget and discussed the Title IX Performance Report. Helland also informed plaintiff that he had received a letter from Steve Ojibway, Tribal Administrator for the St. Croix Tribal Council, in response to plaintiff's May 30, 2000 letter to the education director. Helland appeared angry and reminded plaintiff that he was her boss and that he could fire her. Plaintiff believed that Helland was threatening her. He advised her not to send any more letters to the tribal council without his approval. After the June 22, 2000 meeting, plaintiff did not send further correspondence to the tribal council and believed the matter to be resolved. Plaintiff wrote Helland on June 26, 2000, asking for a copy of Ojibway's letter, but Helland did not respond.

As directed by the Local Indian Education Committee, plaintiff often visited classrooms solely for the purpose of checking up on a student or confirming a tutoring appointment with the student. In early October 2000, Whelihan told plaintiff that she needed to review lesson plans before going into any classrooms to familiarize herself with what was going on in the classroom and that she needed to notify the teacher before she entered any classroom. Plaintiff did not usually enter a classroom to assist with the lesson for the day. Plaintiff did not know of any

other support staff members who had to review lesson plans before entering a classroom or who were required to notify a teacher before entering a classroom. However, unionized support staff did not perform "classroom visits" because they, unlike plaintiff, were already assigned to specific classes' and were a defined part of the lesson plan for students. On October 9, 2000, plaintiff wrote Whelihan a memorandum expressing her views on the subject. The memorandum stated, in part, "I feel that having to go over lesson plans, etc. is time consuming and a hindrance to the education of the Native American student."

On October 13, 2000, plaintiff's daughter, Sunshine, telephoned Rita Joy Staples about enrolling Staples's daughter in the district's Title IX program. Plaintiff was not at home at the time. However, a friend of Sunshine was present when Sunshine made the call to Staples. Sunshine offered to pick up the 506 form from Staples. (The parties do not fully explain the significance of a 506 form.) Staples repeatedly asked Sunshine questions about the Title IX program, and Sunshine responded to the best of her ability. While conversing with Staples, Sunshine recalls her friend stating in the background, "Don't kiss her white ass." Immediately upon hearing the comment, Sunshine disconnected the call. Sunshine asked her friend to leave and then called Staples to apologize for the statement, indicating that "a friend," not plaintiff, had made the comment.

Some time in October 2000, after the conversation with Staples, Sunshine ran into defendant Johnson, board of education member, and explained her side of the story. Johnson told Sunshine to write down what happened and fax him a copy of her story. He also told Sunshine not to worry about the situation because the com-

ment had nothing to do with plaintiff or plaintiff's job.

On October 18, 2000, plaintiff and Taylor attended the Local Indian Education Committee meeting. Taylor read the Committee a monthly report, of which plaintiff received a copy, stating:

> On Friday Oct. 13th I received a call from a parent that was upset and made a complaint to me about LaVonne's daughter calling her and trying to get her to sign the 506 form when she was not feeling well with some health problems she is having. She was also upset because someone in the background made racial comments about her and so she felt discriminated against and called the Sheriff's department. I apologized for LaVonne's daughter's actions and about twenty minutes later she called again to say that LaVonne's daughter had called again and apologized. A letter was sent to me by the parent, because one of the Tribal Council members told her to send it to me and have me distribute it since the parent's health was not good. The parent asked to give a copy to the School Board, the Parent Committee, and the Tribal Council. I also gave one to LaVonne, so that she was not left in the dark on the situation and so that she could talk with her daughter about it. I am not here to cause problems, but I believe that I have to follow through with what a parent asks me to do. And I would trust that my coworker, LaVonne, would do the same if the tables were turned.

Plt.'s PFOF, dkt. # 29, ¶ 368. Plaintiff requested that the above paragraph from Taylor's report be tabled or stricken until plaintiff could respond. On November 8, 2000, plaintiff wrote a response to the Staples incident as part of her revised supplement to Taylor's monthly report for the

Local Indian Education Committee. The response read in part as follows:

> Sharalanee claimed that Rita Joy felt "discriminated against" and called the Sheriff's Department. Apparently, all that was said was "Don't kiss her white ass." Rita Joy views that comment as a "racial slur." How could that be true when she claims to be Native American (1/8 Cherokee)? Why would she take offense to the comment, if she identifies with the Native American culture? That leaves one other possibility, she took offense to having a white behind. I challenge her to prove otherwise.
>
> Sharalanee claimed, "I am not here to cause problems, but I believe that I have to follow through with what a parent asks me to do. And I trust that my coworker, LaVonne, would do the same if the tables were turned." That comment is absurd and ridiculous. Sharalanee and Rita Joy were probably on a mission to get me terminated. (The intentions were apparent when Rita Joy said, "Your mother is going to be in big trouble", and when she wrote about and questioned "people who are representing tribal education" in her letter. Her intent is also apparent by gossip, rumors, distortions and distribution of unsubstantiated claims. It is apparent in the [Johnson O'Malley] report—October 18, 2000 that Sharalanee was out to "cause trouble." . . . (This is not the first time Sharalanee has accused me of negativism in her JOM reports . . .)).

Dfts.' PFOF, dkt. # 17, ¶¶ 45–46. Plaintiff read this statement aloud at the November 8, 2000 Local Indian Education Committee meeting and the statement was made a part of the committee's official minutes.

Staples wrote Helland expressing her dismay over the telephone contacts she had had with Sunshine. Staples explained in her letter that she thought she had heard plaintiff's voice saying demeaning and obscene things in the background of her telephone conversation with Sunshine. Helland later testified at plaintiff's termination hearing that he believed Staples's written account of what happened.

On October 23, 2000, Helland met with Staples and Whelihan to investigate Staples's complaint. Prior to the meeting, Helland also talked to Staples by phone about Staples's allegations. On October 27, 2000, Whelihan telephoned plaintiff and told her that he and Helland wanted to meet with her later that day about a letter from Staples. At the meeting, plaintiff stated that she had been informed that the letter had nothing to do with her or her job. The letter was not discussed further. Helland advised plaintiff that Sunshine should not do anything more with 506 forms. Plaintiff relayed this directive to Sunshine and Sunshine has since complied with the directive. Plaintiff heard nothing more about the matter until her termination hearing in January 2001.

On October 12, 2000, plaintiff and Sunshine drove to Gail Hess's residence in Danbury, Wisconsin, with a blank 506 form for Hess's grandchild. When plaintiff and Sunshine arrived at the house, Leo Luft approached the car. When Luft told plaintiff that Hess was not at home, plaintiff told Luft that he could sign the form because he was the grandparent, which she believed he was. Luft signed the 506 form. On October 18, 2000, plaintiff met with Hess for the first time at an Local Indian Education Committee meeting, at which time Hess asked plaintiff to send her another 506 form for her grandchild because she was interested in the Title IX program. Hess stated that Luft should not have signed the form because he was not the legal guardian of her grandchild. Soon after the meeting, plaintiff sent a letter to Hess enclosing another 506 form. On or about October 25, 2000, plaintiff

received a letter from Hess in response to plaintiff's letter. Plaintiff was surprised by Hess's tone in the letter. On December 5, 2000, defendant Johnson emailed Helland some information he had received from Hess. Around the same time, Helland also received some letters from Hess. One note received by Helland from Hess read:

Copy of letters I mailed Lavonne Crowe after she sent first letter. I didn't ask for any further info but she sent letter 3. You would think that by letter 3 she would know my last name was HESS NOT NESS, another oversight on her part? As to the conversation between her and Mr. Luft I wasn't present. I was at a Tiger Cub meeting with Rusty and my husband Laurance Hess.

Plt.'s PFOF, dkt. # 29, ¶ 423. Helland never discussed the letters he received from Hess with plaintiff.

On November 30, 2000, plaintiff, Whelihan, Phil Knuf (then the at-risk coordinator for the district), and Gerald Becker (then the guidance counselor for the district) met in response to Knuf's concerns that plaintiff was encouraging students not to complete the regular curriculum but to access the alternative curriculum through her. Plaintiff denied the charge. At the end of the discussion, Whelihan said he would give plaintiff an at-risk procedure for future reference and the meeting adjourned. (The parties do not explain the at-risk procedure.) Plaintiff and Knuf believed that the issue had been completely resolved by the end of the meeting. A few days after the discussion, plaintiff received an at-risk procedure form from Whelihan and she followed the procedures during the remainder of her employment with the district.

### B. Denial of Union Membership

Plaintiff expressed interest in joining the union at Webster School District to Helland, who told her she could not join the union. When plaintiff asked why, Helland replied "Because we want to keep it that way." Helland believed the Webster School District wanted to keep the Title IX job out of the union because that was the way it had always been. Helland does not make the decision whether a particular position is union or non-union. That decision is made by the board of education. Nothing in the collective bargaining agreements in effect at the time or in any policy or handbook produced by the district required plaintiff to make a formal proposal to the school board about the union status of the Title IX tutor position.

On June 14, 2000, at a Local Indian Education Committee meeting, plaintiff asked to be included in the support staff union. In the minutes for the meeting, Shirley Holmes wrote:

LaVonne Crowe was asked if she intended to return to school next year. She was also asked if she had a contract. Her reply was yes she would be back and no she did not sign a contract. After some discussion by the members, it was felt that it would be in the best interest to have a contract for being support staff and be able to join the union. A motion was made by Doug Plath and seconded by Shirley Holmes to request that LaVonne be considered for inclusion in the support staff bargaining union. All in favor, motion carried. The secretary will write a letter to the School Administrator and copy to the School Board included with a copy of the minutes.

Plt.'s PFOF, dkt. # 29, ¶ 460. In September 2000, plaintiff submitted her personal goals for the 2000–2001 school year to Helland and gave a copy to Whelihan. One of the goals plaintiff listed was "to become part of a collective bargaining unit and ensure my rights are protected." At the September Local Indian Education Committee meeting, plaintiff expressed

her frustration about not being allowed to be a member of the support staff union.

Defendant Swingle advised plaintiff to contact the representative for the support staff collective bargaining unit and ask her why she was not in the union. Plaintiff discussed the matter with Sue Eytcheson, who was the support staff union representative at that time. Eytcheson then contacted Barry Delaney, the executive director for the Northern Tier Unified Services—West, a regional labor association that assists local associations grouped according to geographic region. Chequamegon United Teachers is part of the Northern Tier Unified Services—West and is a labor organization that functions as the sole and exclusive collective bargaining representative of all non-teaching support staff at the district. The collective bargaining agreement between Chequamegon United Teachers and the district for contract years July 1, 1998, through June 30, 2000, and July 1, 2000, through June 30, 2002 contains a "recognition clause" that excludes from the agreement individuals such as teachers, district administrators, building principals, the dean of students/athletic director, the head custodian and the district administrator's confidential secretary. These positions are excluded because they are managerial, supervisory, confidential or professional positions. Delaney is not aware of any non-managerial, non-supervisory, non-confidential employees of the Webster School District that have not been allowed to join the union during the years 1998 to the present, except the Title IX tutor position.

Plaintiff contacted Delaney in November 2000 to ask why she was not in the union, even though she believed she should be a union employee. On November 22, 2000, Delaney wrote Helland, stating:

It is our understanding that the District has a Title IX Coordinator who is being paid under the wage rates for instructional assistant. Currently, the District is not deducting Union dues from the person holding the Title IX position. Does this mean that the District does not consider this position as part of the support staff bargaining unit? If not, why not? The recognition provision of the Agreement (Article 2) would seem to include this position within the bargaining unit.

Plt.'s PFOF, dkt. #29, ¶475. On or about December 1, 2000, Helland responded to Delaney, indicating that Delaney's question would be placed on the agenda for the regular board meeting scheduled for December 18, 2000. Helland stated that he would respond to Delaney's questions following the board discussion. On December 20, 2000, Helland wrote Delaney to tell him that the Webster School Board had met and decided to table the matter in order to confer with legal counsel, after which the board would respond to Delaney's letter. On January 16, 2001, after Delaney learned that the board had voted to terminate plaintiff, Delaney wrote Helland to say that he was initiating Section 2 of a grievance procedure in relation to plaintiff's termination. On January 23, 2001, Kathryn Prenn, attorney for Webster School District, wrote Delaney, confirming that the Title IX tutor's position had historically been non-union but that the district might be interested in bargaining the position into the support staff unit. Eventually, the support staff union filed a prohibited practices complaint with the Wisconsin Employment Relations Commission under the Municipal Employee Relations Act, asserting that the school district had violated state law when it failed to recognize the Title IX tutor's position as being part of the support staff bargaining unit. The union made no claim that Webster School District's nonrecognition was discriminatory. The Webster School Dis-

trict has denied all the allegations filed with the Wisconsin Employment Relations Commission and is litigating the matter in that administrative forum.

### C. *Termination Proceedings*

On December 13, 2000, Helland called a Local Indian Education Committee meeting. Defendants Johnson and Whelihan were present at the meeting, as were Shirley Holmes, Teresa Johnson and Darlene Matrious. At the meeting, Whelihan recalls Helland's asking the committee whether it supported plaintiff's termination. Whelihan stated that no one present at the meeting had direct knowledge of any of the alleged incidents. Whelihan also did not know whether the allegations against plaintiff regarding the 506 forms were true. Defendant Johnson, former Chairperson for the Local Indian Education Committee, voted for plaintiff's termination in reliance on what he took as documented allegations from the Local Education Association, as represented by Helland and Whelihan.

On December 18, 2000, the school board held a meeting. The school board meeting minutes stated the following:

> Motion by G. Main/S. Treichel, to table the issue involving the Title IX position until further legal counsel. Motion carried with one abstension (Kenn Johnson). Motion by T. Harstad/M. Elliott, to give LaVonne Crowe, Title IX tutor, administrative leave with pay, as soon as legally possible. Motion carried with one abstension (Kenn Johnson)...

Plt.'s PFOF, dkt. # 29, ¶ 509. Plaintiff did not learn about this meeting and the decision to place her on administrative leave with pay until February 2001, after her termination hearing.

Plaintiff continued to work for the Webster School District throughout the month of December until winter break on December 22, 2000. School resumed on January 2, 2001, but plaintiff was home ill from January 2, 2001 through January 5, 2001. Plaintiff returned to school on January 8, 2001. On that day Helland and Whelihan came to plaintiff's office with a letter dated January 8, 2001, stating that the school board was considering the recommendation that plaintiff's employment be terminated and that it would hold a hearing on the administration's recommendation. The reasons provided in the letter for the termination recommendation were 1) plaintiff's failure to follow administrative procedures; and 2) her poor communication skills with parents, staff and students. This was the first that plaintiff knew that the school board was considering a recommendation that her employment be terminated and the first that she learned that the school board had scheduled a hearing on January 15, 2001 to consider her termination. Plaintiff requested a copy of her personnel file. After receiving it, she noticed that there were no letters of reprimand or negative evaluations, only her application, résumé, and insurance enrollment forms.

On January 10, 2001, Helland called plaintiff at home and said that there were some items that should have been in her personnel file when she copied it on January 8 but were not. Plaintiff returned to school to pick up the packet of additional documents. The additional materials were some of the documents later presented by Helland at the termination hearing. However, the packet did not include documents relating to the Hess incident, the letter from Steve Ojibway, or Helland's minutes from the December 13, 2000 Local Indian Education Committee meeting. Helland later indicated that, as of December 13, 2000, he was gathering more information to bring forth to the school board and reviewing some of that information in his office.

Plaintiff attended the January 15, 2001 school board meeting, which she had requested be held as an open meeting. She did not have legal representation. School board members present at the meeting included defendants Elliott, Swingle, Stromberg, Harstad, Main, Johnson, and Treichel. Helland and Whelihan presented a total of eight sets of documents to the school board. These included: 1) the December 17, 1999 letter to Helland from Taylor and plaintiff's December 20, 1999 response to Taylor's letter, written to Helland; 2) Helland's notes from the June 22, 2000 meeting about the Steve Ojibway letter, a copy of the letter and a copy of the May 30, 2000 letter sent by plaintiff to the Tribal Council; 3) some notes regarding the November 30, 2000 meeting between plaintiff and school administration about the at-risk referral procedure issue; 4) a letter written by plaintiff to the Local Indian Education Committee on October 18, 2000, regarding, among other things, the issue of reviewing lesson plans prior to entering a classroom; 5) the October 9, 2000 letter to Whelihan regarding the lesson plan issue; 6) notes from an October 27, 2000 meeting between Whelihan and plaintiff about the Staples incident, a letter from Staples about the incident, and a note from Staples's husband about the incident; 7) communication between plaintiff and Hess regarding the Hess/Luft incident, a note from Hess dated December 5, 2000, about letters mailed to plaintiff, and plaintiff's November 8, 2000 supplement to Taylor's Local Indian Education Committee report; and 8) a copy of the January 8, 2001 letter provided to plaintiff about her pending termination.

Helland recommended to the school board that plaintiff's employment be terminated. Plaintiff spoke on her own behalf and had other witnesses present to support continuation of her employment as the Title IX tutor for the Webster School District. The district did not produce any witnesses who had first hand knowledge of the letter from Ojibway, of Sunshine and Staples's conversation, of Sunshine and plaintiff's conversation with Luft, or of the letters from Hess. After the open hearing portion of plaintiff's termination hearing, the school board retired into executive session. Plaintiff received a phone call the next day from defendant Elliot, who advised her that the board had voted in favor of her termination. The district terminated plaintiff effective January 16, 2001. The district has stated that in regard to the Ojibway letter, Staples incident, and Hess incident, "No formal investigation was undertaken or required because documents received by the school district gave a sufficient account of problems these individuals were having with Ms. Crowe." Plt.'s PFOF, dkt. # 29, ¶ 593.

On April 9, 2001, plaintiff filed a complaint with the State of Wisconsin Department of Workforce Development Equal Rights Division, alleging that her January 15, 2001 termination occurred because of her race. The Equal Rights Division investigated plaintiff's complaint and plaintiff received a probable cause determination on December 20, 2001. On October 1, 2002, plaintiff received a right to sue letter from the U.S. Department of Justice.

### D. Defendants' Treatment of Other District Students and Employees

On January 13, 2000, a Native American student reported a discriminatory comment made by one of the student's teachers, Lawrynk. Plaintiff and the student went to Whelihan's office to report the incident, but no formal complaint was ever filed against Lawrynk regarding the incident.

On November 3, 2000, another Native American Title IX student came to plaintiff's office, crying uncontrollably. The student indicated that Jan Rossow, the in-

school suspension supervisor, had made a comment that upset the student. Plaintiff informed the student's mother and the three of them went to tell Whelihan what happened. Whelihan met with Rossow, plaintiff, the student and the student's mother. The student's mother stated she was very upset and hoped that the school administration would address the issue. No evidence existed in Rossow's file regarding any incidents involving Native Americans.

In January 2001, some Webster High School students, most of whom were Native American, held a protest on school grounds to object to plaintiff's termination. Two students received detention for participating in the protest. One of the students had participated in a prior protest that was approved by staff and administration regarding the defeated school referendum. The student did not receive detention for participating in the prior protest.

Molly Zender, a white woman, replaced plaintiff as the Title IX tutor. Zender did not have much interaction with Helland and typically checked with the building principals for approval. Around May 2002, Whelihan called Zender into his office to discuss a letter of complaint he had received from the Tribal Director for the St. Croix Tribal Education Committee, accusing Zender of being rude to the Tribal Director and her assistant. Zender explained the situation underlying the accusation and Whelihan seemed satisfied with Zender's explanation. After the meeting with Whelihan, Zender heard nothing further about the complaint.

Zender does not think the district required her to notify teachers before going into the classroom. She had no direct involvement with planning or reviewing lesson plans. The school administration was "pretty prompt" in responding to her requests and she does not recall any instance in which an administrator failed to acknowledge any requests, questions or comments she had directed to them. Zender has stated that the level of racial tension she felt in the district between the whites and the Native Americans was higher than she had anticipated.

## OPINION

### A. Plaintiff's Motions to Strike

■ Plaintiff has filed two motions to strike: 1) a motion to strike the affidavit of Kathryn Prenn; and 2) a motion to strike certain of defendants' proposed findings of fact and conclusions of law. As to the first motion, plaintiff argues that Prenn has no personal knowledge of the statements contained in paragraphs 2, 3, 5, and 6 of the affidavit. Fed.R.Civ.P. 56(e) requires supporting and opposing affidavits to be made on personal knowledge, to set forth such facts as would be admissible in evidence, and to show that the affiant is competent to testify to the matters stated in the affidavit. The paragraphs with which plaintiff takes issue discuss exchanges of letters between Helland and Delaney about plaintiff's union status, as well as the status of the Title IX tutor position. There is no evidence that Prenn would have personal knowledge of this information. Thus, I will grant plaintiff's motion to strike paragraphs 2, 3, 5, and 6 of Prenn's affidavit.

Plaintiff's second motion to strike will be granted in part and denied in part. Plaintiff wishes to strike defendants' proposed findings of fact 6, 7, 8, 12, 13, 14, 16, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 32, 33, 35, 37–Sentence 2, 39, 40, 50, 54, 55, 56, 60, 62, 63, 65, 68, 69, 70, 71, 81, 82, 83, 92, 98 and the headings between proposed findings of fact 12 and 13 and between 71 and 72 because the citations for these paragraphs are inadequate or provide insufficient support as required by Fed. R.Civ.P. 56(e) and this court's Procedures

for Filing Motions for Summary Judgment. In their response to plaintiff's motion, defendants agree that paragraph 14 can be stricken, but argue that the majority of the other paragraphs cite to public records, implying that the court can take judicial notice of the information contained in those records. I note, however, that a citation such as "Deposition Ex. No. 18" is not helpful and not in compliance with this court's Procedures for Summary Judgment Motions. *See, e.g.,* Dfts.' PFOF, dkt. # 17, ¶ 2. For example, procedure I©(a) states that, if citing to depositions, the party must give the name of the witness, the date of the deposition and page of the transcript of the cited deposition testimony. Procedure II(E)(1) states that "the court will not search the record for evidence." Furthermore, as plaintiff points out, on numerous occasions defendants cite exhibits referred to in plaintiff's deposition in order to support facts unrelated to the personal knowledge of the plaintiff. For example, in defendants' proposed finding of fact # 26, defendants cite an exhibit presented at plaintiff's deposition to support the fact that Ojibway wrote Helland a letter. Dfts.' PFOF, dkt. # 17, ¶ 26; see also Dfts.' PFOF, dkt. # 17, ¶¶ 16, 28, 30, 31, 32, 35, 55, 56, 60, 62, and 69.

However, I did consider the information provided in defendants' proposed findings of fact paragraph 25, as I was able to readily locate that information and it is a fact about which plaintiff would have personal knowledge. Therefore, I will grant plaintiff's motion to strike paragraphs 6, 7, 8, 12, 13, 14, 16, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 30, 31, 32, 33, 35, 37–Sentence 2, 39, 40, 50, 54, 55, 56, 60, 62, 63, 65, 68, 69, 70, 71, 81, 82, 83, 92, and 98. I will deny plaintiff's motion to strike paragraph 25. As for striking the headings between paragraphs 12 and 13 and paragraphs 71 and 72, I do not consider the headings as proposed findings of fact and therefore will deny plaintiff's motion to strike the headings as unnecessary.

### B. *Defendants' Motion for Summary Judgment*

Plaintiff brings claims under Title VII and 42 U.S.C. §§ 1981 and 1983. Because the same burden-shifting approach applies in determining the merit of plaintiff's employment discrimination claims under any of the statutes, I will address the claims together. *See, St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (applying same framework to claims under 42 U.S.C. § 1981).

Plaintiff contends that defendants Webster School District, Elliott, Swingle, Stromberg, Harstad, Main, Johnson, Treichel, Whelihan and Helland discriminated against her because of her race when they decided to terminate her and failed to thoroughly investigate the evidence brought against her on January 15, 2001. Plaintiff also contends that defendants discriminated against her when they failed to recognize that her position at the district was part of the union. In deciding a summary judgment motion, I must construe the facts and draw inferences in the manner most favorable to the nonmoving party. *See, e.g., Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 984–85 (7th Cir.1999). I will address each of these claims in turn.

#### 1. *Termination of employment*

When racial discrimination is based on a claim of disparate treatment, proof of intentional discrimination is required. *Eiland v. Trinity Hospital,* 150 F.3d 747, 751 (7th Cir.1998). Plaintiff may prove her claim directly by presenting evidence that race was the motivating factor in defendant's decision or indirectly, using the burden-shifting method of proof set forth in

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1397 (7th Cir.1997); *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 2154–55, 156 L.Ed.2d 84 (citing 42 U.S.C. § 2000e–5(g)(2)(B)).

Under the direct method of proof in discrimination cases, a plaintiff must show either an acknowledgment of discriminatory intent by the defendant, *Lim v. Trustees of Indiana University,* 297 F.3d 575, 580 (7th Cir.2002) ("[D]irect evidence should prove the particular fact in question without reliance upon inference or presumption.") (internal quotation omitted), or circumstantial evidence that provides the basis for an inference of intentional discrimination, *Troupe v. May Department Stores,* 20 F.3d 734, 736 (7th Cir.1994). Plaintiff has not shown an acknowledgment of discriminatory intent by defendants, so she must rely on circumstantial evidence. The Court of Appeals for the Seventh Circuit has identified three different types of circumstantial evidence that may show intentional discrimination. *Troupe,* 20 F.3d at 736. "The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* The second type of evidence is that which shows the systematically better treatment of employees similarly situated to the plaintiff other than in the forbidden characteristic. *Id.* The third type of evidence is evidence that shows the plaintiff was qualified for the job but was "passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Id.*

To illustrate the difference between direct and in direct evidence, the court of appeals has held that stating, "I fired Judy because she was an old woman" would be direct evidence of discrimination. *Gorence v. Eagle Food Centers, Inc.,* 242 F.3d 759, 762 (7th Cir.2001). However, a statement such as "old women are hard to deal with" may reveal bias or ignorance but, without more, would be only indirect evidence of discrimination. *Id.* "Bigotry ... is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Id.* (*citing Miller v. American Family Mutual Ins. Co.,* 203 F.3d 997 (7th Cir.2000)).

a. Ambiguous statements, behavior and comments

■ The closest plaintiff comes to showing discriminatory intent is with the first type of circumstantial evidence. Plaintiff attempts to show discriminatory intent on the part of Helland by alleging that 1) he was smirking and whispering while plaintiff and other Native Americans made statements at the termination hearing; 2) he excused his children from school during powwows because it was a "family decision" to do so; and 3) he referred to Native American students as "they," "them," or "those" in a derogatory tone. Plaintiff also tries to show discriminatory intent by noting that Zender believes that racial tensions exist between whites and the Native Americans in the district and that two Native American students received detention for protesting plaintiff's termination.

Defendants do not deny that Helland excused his children from powwows, but plaintiff does not say anything about Helland's action that would allow a factfinder to draw an inference of Native American animus. As to plaintiff's allegation that

Helland "seemed" to be smirking while she and other Native Americans spoke at her termination hearing, her perception of his facial expressions does not demonstrate racism. Finally, plaintiff's allegation of Helland's derogatory attitude is far too vague to stand as evidence from which a factfinder could find racial bias. Even after proposing 654 findings of fact, plaintiff has little to no evidence of Helland's racial bias—nothing to establish a connection between Helland's views and her termination. *See, e.g., Desert Palace, Inc.*, 539 U.S. at —, 123 S.Ct. at 2154 (noting that *plaintiffs* are required to prove a Title VII case by a preponderance of the evidence using direct or circumstantial evidence) (emphasis added). Under the direct method of proof, it is not enough simply to allege that Helland had a general "anti-Native American" sentiment and expect the factfinder to conclude that he fired plaintiff because she is Native American, particularly when the firing came as a response to serious concerns raised by Native Americans who objected to plaintiff's treatment of them. *See Gorence*, 242 F.3d at 762 ("evidence of inappropriate remarks not shown to be directly related to the employment decision may not support a direct-method-of-proof case, but, in connection with other evidence, might support a case under *McDonnell Douglas* "). I consider Helland's actions to be similar to stray remarks. "Stray remarks of a derogatory character do not show direct discrimination unless they are related to the adverse employment action." *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001) (citing *Gorence*, 242 F.3d at 762).

Plaintiff asserts that the differential treatment of two Native American students who received detention because they protested her termination is proof of defendants' discriminatory attitude, but she does not say who gave the two students detention or whether the circumstances of the two protests differed in any respect.

It is notable that plaintiff alleges that the school administration approved the prior protest but says nothing about whether the district approved the protest regarding plaintiff's termination. Plaintiff's unsubstantiated proposed facts would not permit a finder of fact to draw an inference of discriminatory intent.

b. Differential treatment of similarly situated persons

Plaintiff does not meet the second type of circumstantial evidence because she fails to show that others similarly situated to her, from outside the protected class, were treated more favorably. Plaintiff argues that Rossow, Lawrynk and Zender were treated more favorably because they were not formally disciplined after someone complained about them. However, plaintiff provides evidence of only *one* complaint filed against either Zender, Lawrynk or Rossow. It was only after several complaints had been filed against plaintiff that defendants terminated her. Plaintiff has not adduced any evidence to show that the district would not have terminated a person of a different race if the person had been the subject of multiple complaints.

Plaintiff does not advance her claim with her allegations about Helland's lack of involvement in Zender's employment and Zender's belief that she was not required to review lesson plans or notify teachers prior to visiting classrooms. Zender and plaintiff were not similarly situated; therefore, defendants' differential treatment does not imply discrimination. *Simmons v. Chicago Board of Education*, 289 F.3d 488, 492 (7th Cir.2002) (acknowledging that defendants provided a legitimate, nondiscriminatory reason for plaintiff's demotion, including defendants' dissatisfaction with plaintiff's policy of preapproval of all trades and his subsequent insubordinate failure to comply with a supervisor's di-

rective to change that policy). As defendants assert, Helland was involved with plaintiff because people in the community contacted him directly regarding plaintiff's behavior and in one case, accused plaintiff of stealing. Under the circumstances, Helland had a duty to be involved with plaintiff's employment.

As to the administration not applying the same requirements to Zender as it applied to plaintiff, plaintiff offers no evidence that Zender did not review lesson plans or notify teachers before visiting classrooms. It is true that, unlike plaintiff, Zender believed that the school administration replied promptly to her questions and comments. However, plaintiff fails to elaborate on the circumstances surrounding Zender's questions and comments. For example, it is unclear to whom Zender directed her questions and comments, the manner in which she made comments or asked questions or the urgency of the comments or questions. As a result, it is difficult to compare the district's treatment of plaintiff and Zender. Again, it is plaintiff's burden to show comparable circumstances in order to support an inference of discriminatory intent. *Haywood v. Lucent Technologies, Inc.,* 323 F.3d 524, 530 (7th Cir.2003) (noting that plaintiff failed to point to evidence "showing that the other two [white] employees had a comparable set of failings, and thus no inference [could] be drawn" that plaintiff was discriminated against because of her race).

c. Adverse employment decision against qualified member of protected class

The court of appeals has held that the third type of circumstantial evidence in a direct method case is substantially the same as the evidence required under the burden-shifting approach set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Huff v. UARCO Inc.,* 122 F.3d 374, 380 (7th Cir.1997).

Therefore, I will apply the indirect method, or burden-shifting approach, to plaintiff's case next.

In the burden-shifting method, a plaintiff who believes she was fired from a position because of her race can establish a prima facie case by showing that (1) she is a member of a protected class; (2) she was meeting legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated employees outside the class more favorably. *See Foster v. Arthur Andersen, LLP,* 168 F.3d 1029, 1035 (7th Cir.1999). This burden "is not onerous." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If a plaintiff satisfies all of these elements, the burden of production shifts to the defendants to produce a legitimate, nondiscriminatory reason for their actions. *See Burdine,* 450 U.S. at 254, 101 S.Ct. 1089; *Flores v. Preferred Technical Group,* 182 F.3d 512, 514 (7th Cir.1999). If the defendants articulate a nondiscriminatory reason, they have satisfied their burden of production and the *McDonnell Douglas* test is no longer relevant. *Burdine,* 450 U.S. at 255, 101 S.Ct. 1089. The plaintiff then must establish by a preponderance of the evidence that the defendants' proffered nondiscriminatory reason is pretextual. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Flores,* 182 F.3d at 514–515.

The parties do not deny that plaintiff was a member of a protected class or that she suffered an adverse employment action, at least with respect to her termination. I have already determined that plaintiff has failed to show that she was similarly situated to Lawrynk, Rossow or Zender. However, in the interest of thoroughness, I will address plaintiff's arguments that defendants' reasons for terminating her were pretextual. I will conduct

a simultaneous review of part two of the prima facie case and the pretext question because the reasons for plaintiff's removal are "intertwined" with defendants' legitimate performance expectations. *See, e.g., Jones v. Union Pacific Railroad Co.,* 302 F.3d 735, 742 (7th Cir.2002) (stating that courts "often assume the existence of a prima facie case, or consider part two of the test along with the issue of pretext because many times the issues are intertwined.").

When deciding whether to terminate plaintiff, defendants considered documents relating to several incidents in which plaintiff was involved in a conflict with the administration, coworkers, or members of the community with whom plaintiff had contact. Defendants' consideration of these incidents support the reasons defendants provide for plaintiff's termination: 1) failure to follow administrative procedures; and 2) poor communication with parents, staff and students.

Plaintiff argues that defendants' reasons are pretextual because they have no basis in fact and because defendants are lying about their motivations. *See, e.g., Alexander v. Wisconsin Dept. of Health and Family Services,* 263 F.3d 673, 683 (7th Cir.2001) (stating that to show pretext, plaintiff must "show either that the defendants lied about why they took the adverse action that they did or that the defendants' stated reasons for [plaintiff's] suspensions and termination have no basis in fact."). Plaintiff contends that defendants' reasons for termination have no basis in fact because defendants failed to provide her with adequate opportunities to respond and explain the full story, and they failed to call any witnesses with direct knowledge of the incidents and considered matters that had been resolved.

Plaintiff confuses the nature of defendants' burden. Her beliefs about the adequacy of the investigation or the manner in which the hearing proceeded are of no consequence. "An employer's honest belief, whether or not it is mistakenly held, is the issue relevant to these situations." *Jackson,* 176 F.3d at 985. It is enough that the defendants thought the accusations were true and that their belief behind their termination decision was reasonable. *Waters v. Churchill,* 511 U.S. 661, 680, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (stating that "if the belief an employer forms supporting its adverse personnel action is 'reasonable,' an employer has no need to investigate further"). Simply showing that there might be another view of the evidence does not prove that defendants' reasons for terminating her were pretextual. Defendants were entitled to believe that the aggregation of incidents over the course of the year prior to plaintiff's termination provided a reasonable basis on which to terminate her.

Plaintiff attempts to argue indirectly that she was meeting the legitimate expectations of the job. She presents as evidence the job description of the Title IX tutor position that was in effect when she held the post. She then provides numerous accounts from students, parents and teachers who testify to her dedication to students and provide examples of good communication skills. Plaintiff wishes the court to draw an inference that she met the district's legitimate performance expectations of the Title IX tutor position and therefore her termination was wrongful. I do not doubt plaintiff's dedication to the Native American students that she served. However, plaintiff's evidence of good performance does not disprove the occurrence of the incidents on which defendants based their decision to terminate her. The undisputed facts show that plaintiff had difficulties with her relationships with some members of the district community. Plaintiff's November 8, 2000 response to Taylor's monthly Local Indian

Education Committee report was confrontational and insensitive and her threat to publicize the committee's failure to subsidize the Six Flags event showed poor judgment.

Plaintiff attempts to argue that defendants' reasons for her termination are lies. Plaintiff supports this argument by contrasting the school administration's treatment of Zender, Lawrynk and Rossow with her own. However, as I have already noted, plaintiff has failed to show that their circumstances were similar to hers. *Haywood,* 323 F.3d at 530. Moreover, even if such a comparison could be made, it does not support the assertion that defendants lied about the reasons for terminating her.

I find that plaintiff has not raised a genuine issue of material fact to show that defendants' reasons for her termination were pretextual. Because plaintiff has adduced no evidence that implies that race played a part in the decision to fire her, defendants' motion for summary judgment on plaintiff's Title VII, § 1981 and § 1983 claims will be granted with respect to plaintiff's termination claim.

*2. Failure to recognize union status*

 Plaintiff argues that defendants' refusal to allow her into the support staff union was discrimination because of her race, but she has produced no evidence to show that her race played any role in regard to her union status. In fact, it is undisputed that the Title IX tutor position she held has been nonunion historically, which is the reason defendants give for not allowing plaintiff to join the union. Furthermore, it is undisputed that steps were being taken during plaintiff's employment to recognize the Title IX tutor position as part of the support staff union. Plaintiff must present evidence supporting an inference that regardless of the reasons stated by defendants, her race was a motivating factor in defendants' decision to not allow her into union. *See, e.g., Jackson,* 176 F.3d at 984; *Desert Palace, Inc.,* 539 U.S. at ——, 123 S.Ct. at 2155.

Admittedly, it is difficult to show discriminatory treatment in plaintiff's case because she was the only Native American employed by the district in a historically nonunion position. However, she adduced no evidence to show that defendants' reason for not recognizing the Title IX tutor position as part of the support staff union lacked any basis in fact or was untrue. *See, e.g., Alexander,* 263 F.3d at 683. Therefore, because plaintiff has not met her burden of showing that a reasonable jury could find that defendants had discriminated against her in failing to make her position part of the union, I will grant defendant's motion for summary judgment as it relates to plaintiff's ability to join the support staff union.

## ORDER

IT IS ORDERED that

1. Plaintiff LaVonne Crowe's motion to strike paragraphs 2, 3, 5, and 6 of Prenn's affidavit is GRANTED;

2. Plaintiff's motion to strike paragraphs 6, 7, 8, 12, 13, 14, 16, 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 30, 31, 32, 33, 35, 37–Sentence 2, 39, 40, 50, 54, 55, 56, 60, 62, 63, 65, 68, 69, 70, 71, 81, 82, 83, 92, and 98 is GRANTED. Plaintiff's motion to strike paragraph 25 is DENIED. Plaintiff's motion to strike the headings between paragraphs 12 and 13 and paragraphs 71 and 72 is DENIED as unnecessary;

3. The motion for summary judgment by defendants Webster School District, Mark Elliott, David Swingle, Lynn Stromberg, Thomas Harstad, Greg Main, Kenn Johnson, Scott Treichel, Russell Helland, and Kevin Whelihan is GRANTED as it relates both to defendants' termination of

her from her Title IX tutor position and to their failure to recognize the Title IX position as part of the support staff union.

4. The clerk of court is directed to enter judgment for defendants and close this case.